**Peter I. DIAMONDSTONE, Plaintiff–Appellant,**

v.

**Christopher A. MACALUSO, Leroy Prior, David R. Stanton, A. James Walton, Jr., and State of Vermont, Defendants–Appellees.**

**Docket No. 97–7216**

United States Court of Appeals, Second Circuit.

Argued Jan. 20, 1998.

Decided June 22, 1998.

Herbert G. Ogden, Jr., Liccardi, Crawford & Ogden, Rutland,. VT, for Plaintiff–Appellant.

Geoffrey A. Yudien, for William H. Sorrell, Vermont Attorney General, Montpelier, VT, for Defendants–Appellees.

Before: FEINBERG, McLAUGHLIN and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

This case arose out of an unfortunate series of encounters between Trooper Christopher A. Macaluso of the Vermont police and Peter I. Diamondstone, a resident of Brattleboro, Vermont. On a dozen occasions between August 1991 and December 1992, Macaluso pulled over Diamondstone and asked him to produce proof that he had auto insurance. On each of these occasions, Diamondstone—who was, in fact, fully insured—invoked the Fifth Amendment and refused to produce his insurance card. Each time, Macaluso cited Diamondstone for driving without insurance. And each time, the Vermont traffic court entered judgment in favor of Diamondstone. During the twelfth and final traffic stop, Diamondstone and Macaluso got into a scuffle. Macaluso arrested Diamondstone on suspicion of drunk driving. A blood alcohol test revealed that Diamondstone had no alcohol in his system. Nevertheless, Macaluso issued a press release suggesting that Diamondstone had been driving while intoxicated.

As a result of these encounters, Diamondstone filed suit under 42 U.S.C. § 1983, alleging that Macaluso and several of Macaluso's supervisors, as well as the state of Vermont, had violated his constitutional rights. The United States District Court for the District of Vermont (J. Garvan Murtha, *Chief Judge*) granted partial summary judgment to the defendants, ruling that the motor vehicle stops for lack of insurance were based upon reasonable articulable suspicion that Diamondstone was violating the law. Judge Murtha allowed Diamondstone's claims against Macaluso for assault, battery, false imprisonment, malicious prosecution, trespass to chattels, and defamation to go to trial. The jury returned a verdict in favor of Macaluso on all of these claims except for Diamondstone's defamation claim. While the jury found that Macaluso had defamed Diamondstone, it awarded no damages.

Diamondstone appeals both from the grant of partial summary judgment and from the court's upholding of the jury verdict. We affirm in part and reverse in part.

## I. FACTS

The case involves many, many traffic stops and several trips to the Vermont traffic court to adjudicate the propriety of those stops. The timing of the incidents is important to our analysis, and so it is necessary to go over the sequence of events in some detail.

**Prologue:** The saga began in 1987, when a police officer (not Macaluso) stopped Diamondstone for allegedly operating a motor vehicle without a state inspection sticker. In response to the officer's request for proof of insurance, Diamondstone said he did not have his card. The officer then asked if he had insurance. Diamondstone refused to answer, invoking his Fifth Amendment right against self-incrimination. The officer cited Diamondstone for driving without insurance in violation of Vt. Stat. Ann. tit. 23, § 800. A Vermont district court ruled that Diamondstone had a constitutional right to refuse to say whether or not he had auto insurance and that his refusal to answer a police officer's questions about his insurance could not be used against him in court. Since there was no evidence that suggested that Diamondstone lacked insurance (aside from Diamondstone's lack of a state inspection sticker and his refusal to answer questions), the court dismissed the citation. A little while later, Diamondstone was again cited (not by Macaluso) for driving without insurance, and the citation was dismissed on the same grounds.

**Macaluso Stop # 1**: Diamondstone apparently steered clear of the traffic police for the next several years. But on August 27, 1991, Trooper Macaluso pulled Diamondstone over for illegally passing him on a curve and for having defective equipment. At the time, Diamondstone was driving a white 1981 Renault with a valid state inspection sticker. To obtain a state inspection sticker, a driver must produce proof of insurance. Macaluso asked Diamondstone for his license, registration, and proof of insurance. Diamondstone produced his license and registration, but refused to provide proof of insurance. He told Macaluso that he had a constitutional right to refuse to provide proof of insurance, citing the two Vermont district court opinions. Macaluso charged him with driving with defective equipment and told him he needed to furnish proof of insurance within fifteen days or he would be cited for driving without insurance in violation of Vt. Stat. Ann. tit. 23, § 800. Diamondstone did not furnish proof of insurance within fifteen days. As it turns out, Diamondstone *did* have insurance, but for whatever reason, he preferred not to respond to Macaluso's questions and thought he had a right not to do so.

**Stop # 2**: On December 2, 1991, Macaluso pulled Diamondstone over for speeding. He may also have been motivated to pull Diamondstone over because he knew that Diamondstone had not produced proof of insurance within fifteen days of the first stop. Again, Diamondstone refused to provide proof of insurance. Macaluso cited him for driving without insurance in violation of Vt. Stat. Ann. tit. 23, § 800. In this encounter, Diamondstone was driving his wife's 1983 black Renault station wagon, a different car from the one that he was driving in August. This car also had a valid inspection sticker.

**Traffic Court Round I**: On February 18, 1992, the case came before Vermont traffic court hearing officer Michael Pratt. The hearing officer found that Macaluso did think that Diamondstone was speeding on December 2, 1991, but that the insurance was "the critical issue leading to the stop." Diamondstone raised the Fifth Amendment as a defense to the insurance citation, citing the two earlier cases. The hearing officer noted that, in the time since those decisions, Vermont had decriminalized its traffic violations. As a result, he held that the Fifth Amendment right against self-incrimination, which only applies in criminal matters, see U.S. Const. amend. V ("nor shall any person ... be compelled *in any criminal case* to be a witness against himself") (emphasis added), could not be invoked by Diamondstone. Nevertheless, the court found that Diamondstone's refusal to answer the question was insufficient evidence on which to issue a citation. In addition, the hearing officer noted that it was unclear whether the citation was for the August 27th or the December 2nd incident or for both of them, and entered judgment for Diamondstone on both. The hearing officer advised Macaluso that the State had a right to appeal, but no appeal was taken.

**Stops # 3, 4, 5, and 6**: On April 9 and June 5, 17, and 25, 1992, Macaluso stopped Diamondstone. The sole reason for each of these stops was to ask Diamondstone for proof of insurance. Diamondstone refused to provide proof of insurance on each occasion, and Macaluso issued him a citation for lack of insurance on each occasion. On these dates, Diamondstone was driving his son's green Datsun pickup truck, which was, like the other cars, insured and which bore a valid state inspection sticker.

**Traffic Court Round II**: On June 30, 1992, the April 9th citation came before traffic court hearing officer Pratt. Diamondstone moved to dismiss the ticket on the grounds that Macaluso lacked probable cause to stop him. Macaluso testified that he stopped Diamondstone because he thought, based on the earlier encounters, that Diamondstone was driving without insurance. The hearing officer ruled as follows:

> The two differences between this case and those other cases, first in those other cases probable—the probable cause, or the proper basis for the stop, the reasonable belief that a violation had occurred, stemmed from a violation that the officer felt he observed on the spot at that time. We don't have that in this case.
>
> This is intertwined with this insurance issue, and the issue that I raised here

today as far as did that insurance issue become stale as far as providing a reasonable basis for making the stop?

Trooper Macaluso made his position on the matter crystal clear, stating "As I've said, all I wanted from Mr. Diamondstone is proof of insurance. I don't think that's an unreasonable request. . . . If he'd show it to me right now, as I've said, I'd be more than happy, more than willing, to dismiss everything. If not, *I will continue to stop him and issue as I feel I generally have probable cause.*" (emphasis added). In the end, the hearing officer concluded that Macaluso, in fact, did *not* have probable cause to make the stop, explaining that "I don't think a person is indefinitely subject to stops" based on an event that occurred several months earlier. The hearing officer dismissed the citation. This ruling was not appealed.

**Stops # 7, 8, 9, and 10:** Macaluso stopped Diamondstone on July 24 and 26, and August 5 and 6, 1992. (Diamondstone was driving the green Datsun on these occasions.) Again, the stops were based solely on Diamondstone's refusal to provide proof of insurance during the prior stops. Each time, Diamondstone invoked his Fifth Amendment rights. Each time, Macaluso issued him a ticket. During the July 24th stop, Macaluso told Diamondstone he was going to pull him over and give him a ticket every time he saw him on the road.

Diamondstone alleges that three other police officials became involved in the case on or about this time. Macaluso's supervisor, David Stanton, was present during the July 26th stop. Diamondstone told Stanton that he believed the stops were unconstitutional. Stanton replied that Macaluso was just doing his job. On August 11, Diamondstone called Public Safety Commissioner A. James Walton to complain about the stops. He told Walton that he thought he had a constitutional right not to provide proof of insurance. In addition, he told Walton that the traffic court had, on June 30, dismissed a citation against him for lack of probable cause. Diamondstone claims that Walton did not respond. Diamondstone then spoke to Leroy Prior, another of Macaluso's supervisors, and gave him the same information. Diamondstone asserts that Prior also made no response to his complaints.

**Stop # 11:** On September 10, 1992, Macaluso stopped Diamondstone for not using a turn signal and issued him a citation for this offense. Diamondstone refused to provide proof of insurance during this stop. On September 27, 1992, Macaluso issued a citation for operating without insurance on September 10th.

**Traffic Court Round III:** The citations resulting from the June 5, 17, and 25 stops were heard in traffic court by hearing officer Pratt on September 22. Macaluso said he had stopped Diamondstone because, based on the earlier stops, he thought he was driving without insurance. The traffic court held that Macaluso lacked a reasonable basis for making the stops and dismissed all of the citations. No appeal was taken.

**Stop # 12:** On December 22, 1992, Macaluso pulled Diamondstone over again. At the time, Diamondstone was driving a tan 1981 Renault. This time, Diamondstone, refused to provide his license and registration, in addition to refusing to hand over proof of insurance. When Macaluso demanded the license and registration again, Diamondstone sat silently in his car. Macaluso then opened the car door. According to Diamondstone, Macaluso claimed that he smelled alcohol on Diamondstone's breath, and told him that if he did not get out of the car, he (Macaluso) would drag him out. The officer does not recall this statement.

The parties dispute what happened next. Diamondstone claims that Macaluso yanked him from the car, grabbed him from behind, lifted him off the ground, and threw him on the hood of his police cruiser. Macaluso denies this. There is no doubt, however, that Macaluso took Diamondstone to the police station to process him for driving under the influence of alcohol.

Once at the police station, Diamondstone took a breath test. The first result was .002. A repeat test, conducted a minute or two later, came out to .000. Accordingly, Macaluso did not cite him for driving under the influence, but he did cite Diamondstone for disorderly conduct. In addition, Macaluso

issued a press release suggesting that Diamondstone had been driving while intoxicated. An article based on this press release was published in the local newspaper a few days later.

The State's attorney returned the disorderly conduct citation to Macaluso with a note saying he could not prosecute because Macaluso lacked probable cause for stopping Diamondstone on December 22.

**Traffic Court Round IV:** On January 19, 1993, the citations from the July 24 and 26, and August 5 and 6 stops went before hearing officer Pratt. The hearing officer again concluded that Macaluso had no reasonable basis for stopping Diamondstone and dismissed the citations. On the same day, hearing officer Pratt also considered the September 10th (no-turn-signal and no-insurance) citations as well as a citation arising out of the June 17th stop, during which Diamondstone allegedly refused to return to his car when instructed to do so. The court issued a written ruling on these citations on May 17, 1993, holding Diamondstone liable for failing to use his turn signal, but dismissing the rest of the citations.

The court noted that, over the course of several months, "Trooper Macaluso's proper intentions evolved into frequent stops solely for the purpose of asking about Mr. Diamondstone's insurance" and that the court had dismissed many previous citations on the grounds that Macaluso had no proper basis for stopping Diamondstone. Given its conclusion that Macaluso lacked a reasonable basis for stopping Diamondstone on June 17, the court dismissed the citation that alleged Diamondstone's failure to return to his car that day. With respect to the September 10th stop, the court found that the stop was proper, in view of Diamondstone's failure to signal, but that Diamondstone's refusal to answer questions about his insurance, standing alone, was insufficient to support liability. Accordingly, it dismissed the citations.

\* \* \*

As a result of these twelve traffic stops, on April 7, 1995, Diamondstone filed suit against Macaluso, Prior, Stanton, Walton and the State of Vermont in the United States District Court for the District of Vermont.

Count I of his complaint alleged, pursuant to 42 U.S.C. § 1983, that they had violated his rights under the Fourth, Fifth, and Fourteenth amendments, including his right to be protected from unreasonable searches and seizures and his right not be denied liberty without due process of law. Count II raised the same claims under the Vermont Constitution. Count III claimed that his First Amendment rights had been violated because he was on his way to a peace vigil when he was stopped on June 5 and 17, 1992, and that Macaluso intended to interfere with his free speech rights in making those stops. Count IV made the same free speech claim under the Vermont Constitution. Count V was for the common law torts of assault, battery, false arrest, false imprisonment, malicious prosecution, trespass to chattels, and defamation.

On June 19, 1995, the case was assigned to Judge Murtha. Sometime thereafter, the parties filed cross-motions for partial summary judgment. The defendants claimed that (a) the motor vehicle stops were supported by reasonable suspicion and probable cause; (b) the individual defendants were protected by qualified immunity; and (c) the Eleventh Amendment barred the claims against the state. Diamondstone cross-moved for summary judgment, claiming that the court should give collateral estoppel effect to the traffic court's holding that eight of the 1992 no-insurance stops were not supported by reasonable suspicion.

The district court held: (1) that the traffic court's rulings should not be granted preclusive effect because, under Vermont law, the defendants had not been afforded a full and fair opportunity to litigate the issues in traffic court; (2) that the Fifth Amendment right against self-incrimination did not apply because Vermont's traffic code is civil rather than criminal in nature; and (3) that all of the stops were legal because Diamondstone's refusal to answer questions about his insurance was sufficient to create reasonable suspicion about his insurance status and the use of his silence in this manner was not barred by the Fifth Amendment.

Accordingly, the district court held that the traffic stops did not violate Diamondstone's Fourth or Fifth Amendment rights, and granted summary judgment to Macaluso on the claims arising out of those stops. The court also granted summary judgment to Prior, Stanton, and Walton as to all of Diamondstone's claims, holding that they were entitled to qualified immunity. And the court dismissed the claims against the State of Vermont based on the Eleventh Amendment.

On July 23, 1996—after Judge Murtha had granted partial summary judgment to the defendants but before the trial on the remaining claims—Diamondstone moved to have the judge recuse himself. Diamondstone claimed that Judge Murtha was hostile to him because of Diamondstone's participation in peace protests during the Gulf War. Murtha and Diamondstone were, like many people in the small city of Brattleboro, acquaintances who exchanged greetings when they passed on the street. Diamondstone alleged that, prior to the anti-war protests, Murtha had always said "Hi Peter!" when he saw Diamondstone. According to Diamondstone, this changed when Diamondstone started participating in the peace vigils outside the Brattleboro post office/court house. Diamondstone alleges that on several occasions while he was at the vigil, he greeted Murtha (who had not yet been appointed to the bench and was at that time a lawyer in private practice) as Murtha walked past. Murtha, Diamondstone alleges, snubbed him by not responding. Diamondstone claimed that this showed that Judge Murtha would be hostile to Diamondstone's claim that Macaluso had infringed upon his First Amendment rights by pulling him over while he was on his way to the peace vigil. In addition, Diamondstone contended that Murtha's personal knowledge about the peace vigil also required recusal.

Judge Murtha declined to recuse himself. He held that the motion was untimely, since Diamondstone had known about the events which allegedly demonstrated bias for more than a year before he made the motion. In the alternative, he held that, even if the facts were as Diamondstone alleged, no reasonable person could look at those facts and conclude

that Murtha was so biased against Diamondstone as to be incapable of presiding fairly over the case. In addition, Judge Murtha stated that his personal knowledge about the peace vigils that Diamondstone attended was no greater than that of any other resident of Brattleboro who had occasion to pass by the post office during the months of the vigil, and hence that it did not require recusal.

The remaining claims against Macaluso were tried before a jury. These claims included: (1) the federal constitutional claims related to the incident on December 22 in which Macaluso allegedly used excessive force in pulling Diamondstone out of his car; (2) the First Amendment claim; and (3) the common law torts of assault and battery, false arrest, false imprisonment, malicious prosecution, and defamation. The jury rendered a verdict for the defendant on all counts except for the defamation claim. Although the jury determined that Macaluso had defamed Diamondstone, it awarded no damages.

Diamondstone moved for a judgment notwithstanding the verdict on the excessive force and malicious prosecution counts and for a new trial on the damages portion of the defamation count. The district court denied these motions, and Diamondstone appealed.

## II. DISCUSSION

### A. Recusal

██ The law provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Specific instances where recusal is required include situations in which the judge has "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." *Id.* § 455(b)(1). We review a judge's denial of a recusal motion for abuse of discretion. *See, e.g., United States v. Thompson,* 76 F.3d 442, 451 (2d Cir.1996).

██ As we have stated,

[i]n deciding whether or not to affirm a judge's denial of a recusal motion, a court of appeals must ask the following question: Would a reasonable person, knowing all

the facts, conclude that the trial judge's impartiality could reasonably be questioned? Or phrased differently, would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt that justice would be done absent recusal?

*United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir.1992) (citations omitted). "Disqualification is not required on the basis of 'remote, contingent, indirect or speculative interests.'" *Thompson*, 76 F.3d at 451 (citation omitted).

■ In the case before us, Judge Murtha did not abuse his discretion in declining to recuse himself. A disinterested observer could not reasonably question Judge Murtha's impartiality based upon his alleged failure to return the plaintiff's greetings. Nor did Judge Murtha gain any "personal knowledge of disputed evidentiary facts concerning [this] proceeding," 28 U.S.C. § 455(b)(1), by walking past the peace vigils, which were only tangentially related to Diamondstone's claims.

*B. Partial Summary Judgment*

Diamondstone challenges the district court's grant of summary judgment to the defendants on his claims that his rights under the Fourth and Fifth Amendments were violated by the traffic stops.

The Fourth and Fifth Amendments of the United States Constitution have been described as core protections against "governmental invasions 'of the sanctity of a man's home and the privacies of life'" which "'affect the very essence of constitutional liberty and security.'" *Griswold v. Connecticut*, 381 U.S. 479, 484 & 484 n. *, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886)); *see also Mapp v. Ohio*, 367 U.S. 643, 656, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ("The right to privacy" embodied in the Fourth Amendment is "no less important than any other right carefully and par-

ticularly reserved to the people" by the Constitution and is "basic to a free society") (internal quotation marks and citation omitted). These two amendments reflect "supplementing phases of the same constitutional purpose—to maintain inviolate large areas of personal privacy." *Feldman v. United States*, 322 U.S. 487, 489–90, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944). "The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence...." *Mapp*, 367 U.S. at 657, 81 S.Ct. 1684.

The district court held that the Fifth Amendment privilege against self-incrimination did not apply because Vermont's traffic code is civil rather than criminal in nature. And the court concluded that Diamondstone's refusal to produce proof of insurance created, for Fourth Amendment purposes, a reasonable suspicion that he was violating the law. Although we agree with the district court that the Fifth Amendment does not prevent Vermont from requiring motorists to produce proof of insurance, we conclude that a number of the traffic stops in the instant case were not supported by reasonable suspicion and that these stops therefore violated Diamondstone's Fourth Amendment right to be free from unreasonable searches and seizures.[1]

It is beyond cavil that people in this country have the generic right to be left alone. But it is also indisputable that "[a]n organized society" necessarily and permissibly "imposes many burdens on its constituents," thereby reasonably limiting that right. *California v. Byers*, 402 U.S. 424, 427, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) (plurality opinion). In furtherance of civil regulatory schemes, the government may require citizens to provide it with certain information. For example,

> [our society] commands the filing of tax returns for income; it requires producers and distributors of consumer goods to file

---

1. While we concur with Diamondstone that many of Trooper Macaluso's stops were not supported by reasonable suspicion, we base this conclusion upon our own *de novo* review of the record, and not as a result of giving the findings

of the traffic court preclusive effect. For substantially the reasons given by the district court, such preclusive effect is not appropriate in the circumstances of this case.

informational reports on the manufacturing process and the content of products, on the wages, hours, and working conditions of employees. Those who borrow money on the public market or issue securities for sale to the public must file various information reports; industries must report periodically the volume and content of pollutants discharged into our waters and atmosphere.

*Id.* at 427–28, 91 S.Ct. 1535.

■ For the most part, the Constitution also does not prohibit the government from asking individuals questions about their compliance with civil regulatory schemes like those mentioned above, even when the disclosure of the information may lead to adverse consequences for those individuals. This is so because the text of the Self–Incrimination Clause is limited to "criminal cases." U.S. Const. amend. V ("[N]o person ... shall be compelled *in any criminal case* to be a witness against himself.") (emphasis added). To be sure, courts have long held that the privilege against self-incrimination

not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, investigatory or adjudicatory, where the answers might incriminate him in future criminal proceedings.

*Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). But where there is no likelihood that the information requested may be used in some *criminal* proceeding, the privilege generally does not apply.

■ Although Vermont law requires motorists to carry insurance, and to provide proof of that insurance when asked, drivers who lack insurance are not subject to criminal penalties. In 1989, the Vermont legislature passed a bill decriminalizing most minor traffic violations. *See* Vermont Public Act No. 109 (1989) ("The purpose of this act is to treat minor traffic violations as civil violations, removing them from the criminal

courts and removing the label of criminality from those who commit them."). As a result, the Vermont code currently distinguishes between the more serious traffic *"offenses"* and minor traffic *"violations." Compare* Vt. Stat. Ann. tit. 23, § 2202 (1987 & Supp.1997) (traffic offenses) *with id.* § 2301 (1987 & Supp.1997) (traffic violations). In creating the category of traffic "violations," the 1989 Act gave exclusive jurisdiction over them to the newly established traffic and municipal ordinance bureaus. Serious traffic "offenses" (like drunk driving) were not decriminalized and are still heard as criminal matters in the state's district courts.

Vermont law defines civil traffic "violations" as transgressions of "any provision of [title 23] ... for which no term of imprisonment is provided by law, and for which a penalty of no more than $1,000.00 is assessed." Vt. Stat. Ann. tit. 23, § 2302(2) (Supp.1997). The maximum penalty for driving without insurance is $100, and entails no term of imprisonment. *See* Vt. Stat. Ann. tit. 23, § 800(b) (Supp.1997). Accordingly, driving without insurance is a civil infraction, rather than a criminal offense, under Vermont law.[2]

As Diamondstone points out, the Supreme Court of the United States has held that the privilege against self-incrimination may apply in some civil cases, such as forfeiture actions, that are so punitive that "though they may be civil in form, are in their nature criminal." *Boyd v. United States,* 116 U.S. 616, 634, 6 S.Ct. 524, 29 L.Ed. 746 (1886). He argues that the civil penalties he faced were of this sort. We believe, however, that the sanctions imposed for driving without insurance in Vermont are not sufficiently punitive as to transform the offense from a civil, regulatory violation into a criminal one. *See generally SEC v. Palmisano,* 135 F.3d 860, 864–65 (2d Cir.1998) (listing factors to be considered in determining whether a "sanction is so punitive in nature as to transform what was intended as a civil remedy into a criminal penalty").

2. Given the new definition of "violation" provided in section 2302(2), the fact that section 800 still refers to driving without insurance as a

traffic "offense" appears to be of no consequence.

Like the law upheld against Fifth Amendment challenge in *California v. Byers,* 402 U.S. 424, 430, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) (plurality opinion), Vermont's law requiring motorists to carry insurance and to provide proof of insurance when asked is "not intended to facilitate criminal convictions but to promote the satisfaction of civil liabilities arising from automobile accidents." *Id.* at 431, 91 S.Ct. 1535. Since driving without insurance is not a criminal offense in Vermont, that state may require motorists to provide proof of insurance and may draw an adverse inference from a motorist's refusal to do so, without infringing the Fifth Amendment.

■ The fact that Vermont may order citizens to provide proof of insurance in conjunction with a valid traffic stop or when they apply for their annual state inspection sticker does not, however, mean that the state police may pull motorists over without probable cause for the sole purpose of asking them to provide proof of insurance. *See Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (police may not stop motorists simply to ask for license and registration). In terms of the impact on liberty, there is a fundamental difference between being asked to answer questions in certain well-defined settings and being subjected to random detentions by government officials seeking information. *See id.* at 657, 99 S.Ct. 1391 (contrasting stops of individual motorists, which generally entail "an unsettling show of authority," "interfere with freedom of movement, are inconvenient, and consume time," and which "may create substantial anxiety" for the driver with traffic checkpoints where every motorist is stopped and individuals are "much less likely to be frightened or annoyed by the intrusion").

■ Unlike the Fifth Amendment, the Fourth Amendment's "protection against unreasonable searches and seizures fully applies in the civil context." *Soldal v. Cook County,* 506 U.S. 56, 67 n. 11, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). And the Supreme Court has held that "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Therefore, as the Court stated:

> [a]n automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.

*Whren,* 116 S.Ct. at 1772.[3]

■ In the instant case, the court below held that the Fourth Amendment was not violated. The district court concluded that, given Diamondstone's failure to provide proof of insurance during stops 1 and 2, Macaluso had a reasonable suspicion for stopping Diamondstone in stops 3–12. The court based its conclusion on the fact that Diamondstone did not have a Fifth Amendment right to withhold this information and that—even if he did—his silence could be used against him in a civil action.

But Diamondstone contends that, even if the Fifth Amendment privilege is inapplicable, the stops were not supported by reasonable suspicion because (a) Trooper Macaluso's information had grown stale in the four months between stop 2 and stop 3; (b) Diamondstone was driving different cars during

**3.** The seminal case on auto stops of this type is *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In *Prouse,* the Court held that it violated the Fourth Amendment to stop an automobile for the purpose of checking the license and registration,

> where there is neither probable cause to believe nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to

seizure or detention in connection with the violation of any other applicable laws.

*Id.* at 650, 99 S.Ct. 1391. The Court stated that "[t]he essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions.'" *Id.* at 653–54, 99 S.Ct. 1391 (citations and footnote omitted).

the later stops and since cars, not people, carry insurance, it was unreasonable to assume that those cars were uninsured simply because *he* was driving them; and (c) the presence of valid inspection stickers on all the cars indicated that they were insured and thus negated any inference that might otherwise be drawn from his refusal to answer questions. Moreover, Diamondstone notes that there was no proof, other than his earlier invocation of the Fifth Amendment, to suggest that he lacked insurance.

 We review *de novo* the district court's conclusion that the stops were supported by reasonable suspicion. *See, e.g., United States v. Bold,* 19 F.3d 99, 102 (2d Cir.1994). In determining whether Trooper Macaluso had a reasonable suspicion that Diamondstone was breaking the law, we examine the "totality of the circumstances." *Marshall v. Sullivan,* 105 F.3d 47, 54 (2d Cir.1996). In the case before us, the relevant factors to be considered include the type of evidence relied upon by Trooper Macaluso, the lapse of time between the acquisition of that evidence and the subsequent stops, and the existence of evidence that suggested that Diamondstone did, in fact, have insurance.

For the reasons explained above, the Fifth Amendment does not preclude the use of Diamondstone's silence against him in the context of a non-criminal traffic violation. And as Justice Brandeis wrote, "[s]ilence is often evidence of the most persuasive character." *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 153–54, 44 S.Ct. 54, 68 L.Ed. 221 (1923). But we conclude that, looking at all of the circumstances, Diamondstone's refusal to answer Trooper Macaluso's questions in August and December 1991 was insufficient to create a reasonable suspicion that Diamondstone was driving without insurance when he was next stopped in April 1992.

 As the Supreme Court stated long ago, the rule with respect to warrants is that "the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause *at that time*." *Sgro v. United States,* 287 U.S. 206, 210, 53 S.Ct. 138, 77 L.Ed. 260 (1932) (emphasis added). In the Second Circuit, the "principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law." *Rivera v. United States,* 928 F.2d 592, 602 (2d Cir.1991) (quoting *United States. v. Martino,* 664 F.2d 860, 867 (2d Cir.1981)); compare *Martino,* 664 F.2d at 867 (time lapse less important in case of ongoing criminal activity, such as a narcotics conspiracy) *with United States v. Wagner,* 989 F.2d 69, 75 (2d Cir.1993) (time lapse more important in case involving isolated illegal acts). In general, "the determination of whether information presented in support of an application is sufficiently current to support a finding of probable cause is one that must be made on the basis of the facts of each case," *Martino,* 664 F.2d at 867.

In the case before us, there was a significant lapse of time between stop 2, which was based on an observed traffic violation, and stop 3, which was based solely on Diamondstone's behavior during stops 1 and 2. Other than his refusal to answer Macaluso's questions during stops 1 and 2, there was no evidence whatsoever that Diamondstone lacked insurance. Indeed, the presence of the valid annual inspection stickers on each of the cars he was driving indicated that he must, at some relatively recent time, have carried insurance, despite his persistent refusal to admit that he did. *Cf. Prouse,* 440 U.S. at 660, 99 S.Ct. 1391 ("[U]nder Delaware law, to qualify for annual registration a vehicle must pass the annual safety inspection and be properly insured. It does not appear, therefore, that a stop of a Delaware-registered vehicle is necessary in order to ascertain compliance with the State's registration requirements."). And it is worth noting that Diamondstone's presentation of a card from his insurance company probably would have provided no greater assurance that he was currently insured than the annual inspection sticker, for just as Diamondstone might have canceled his insurance after getting the sticker, he might have canceled it after getting an insurance card.

At most, Macaluso might have had cause to believe that Diamondstone would refuse to provide proof of insurance when he was

stopped (and even this is doubtful, given the passage of time between the stops). According to the defendants, Vermont law does allow a citation for driving without insurance to be based upon a failure to provide proof of insurance at the request of a law enforcement officer. *See* Defendant's Brief at 9 (citing Department of Motor Vehicles Administrative Procedure 38(D), 38(E)). By virtue of this provision, failure to provide proof of insurance is deemed evidence of a traffic violation, if not a traffic violation itself, under Vermont law. In this regard, it is noteworthy, however, that each time Diamondstone's case came up, the Vermont traffic court held that his failure to provide proof of insurance was insufficient under the statute to make him liable for *driving* without insurance.

But a traffic stop may not be based on the suspicion that, if stopped, a motorist may subsequently do something that violates the law. Thus, a police officer may not stop a pedestrian simply because she suspects that the pedestrian will react to her questioning by behaving in a disorderly manner. And a citizen is not subject to arrest based on the suspicion that he might respond by resisting arrest. *A fortiori*, a stop may not be based on the belief that the suspect, if stopped, may react by doing something that is itself no more than evidence of a violation of the law.

Under the circumstances, we conclude that the undisputed facts show that Trooper Macaluso had "neither probable cause to believe nor reasonable suspicion," *Prouse*, 440 U.S. at 650, 99 S.Ct. 1391, that Diamondstone was violating the law during stops 3–10 and 12.[4] Accordingly, we hold as a matter of law that these stops violated Diamondstone's right to be free from unlawful searches and seizures.

*C. Malicious Prosecution Claim*

Diamondstone also seeks to set aside the jury's verdict in favor of Macaluso on Diamondstone's state law claim for the tort of malicious prosecution. In Vermont, a plaintiff alleging malicious prosecution must show "that the opposing party had instituted a proceeding against him without probable cause, with malice, . . . that the proceeding had terminated in the claimant's favor" and that "he suffered damages as a result of the prior proceeding." *Chittenden Trust Co. v. Marshall*, 146 Vt. 543, 507 A.2d 965, 969 (1986). Diamondstone contends that it was error for the district court to instruct the jury—as it did—that Macaluso had the requisite probable cause to stop him on the numerous occasions when Macaluso pulled him over.

The substance of jury instructions is reviewed *de novo*. *See, e.g., United States v. Masotto*, 73 F.3d 1233, 1238 (2d Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 54, 136 L.Ed.2d 18 (1996). "A jury verdict will be reversed only when an appellant can show that the instructions considered as a whole prejudiced him." *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 521 (2d Cir.1998). "An error exists if the jury was misled about the correct legal standard or was otherwise inadequately informed regarding the controlling law, and where such error is other than harmless, a new trial is required." *Id.*

For the reasons stated above, we believe that Macaluso did not have probable cause to stop Diamondstone. The jury, therefore, should not have been told that he did. This instruction may very well have prejudiced Diamondstone, for it went to an essential element of his claim. The jury could have inferred from the instruction that if Macaluso had probable cause to stop Diamondstone on suspicion that he lacked insurance, then Macaluso also had probable cause to cite him for driving without insurance. And the allegedly malicious prosecution on the latter citation is the core of this part of Diamondstone's suit. Accordingly, we are obliged to order a new trial on the malicious prosecution issue.

---

4. Stop 11 was supported by an independent and legitimate traffic violation—Diamondstone's failure to use a turn signal. For substantially the same reasons as stated with respect to stops 3– 10, we believe, however, that stop 12 was not sufficiently supported by stop 11, which occurred two-and-a-half months earlier.

### D. Excessive Force and Defamation Claims

Diamondstone also asks us to enter a judgment notwithstanding the verdict on his claim that Macaluso used excessive force against him during stop 12. And he requests a new trial on the issue of damages on the defamation count. We have carefully reviewed his arguments in this regard, and on the record before us, we see no basis for reversing the jury's verdict on these counts.

### E. Qualified Immunity

#### i. Macaluso

Government officials are protected from suits against them in their individual capacity for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir.1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Even "[w]here a right is clearly established, 'the defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition.' " *Id.* (quoting *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir.1996)). Qualified immunity does not shield officials who "knowingly violate the law." *Catanzaro v. Weiden*, 140 F.3d 91, 96 (2d Cir.1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

In the instant case, we have grave doubts as to whether Trooper Macaluso is entitled to qualified immunity. Given the traffic court's repeated rulings in Diamondstone's favor, it is hard to see how a reasonable officer in Macaluso's position could have believed his actions to be lawful. On February 18, 1992, the traffic court concluded that Diamondstone's failure to produce proof of insurance

on August 27 and December 2, 1991, was insufficient to support a citation for driving without insurance. If there were any doubt in Trooper Macaluso's mind after the February 18, 1992, ruling as to whether his actions were legal, that doubt should have been put to rest by the traffic court hearing officer's finding on June 20, 1992, that the "insurance issue [had become] stale as far as providing a reasonable basis for making the stop." Yet Macaluso ignored this ruling and stopped Diamondstone on five additional occasions. While the traffic court's findings are not entitled to preclusive effect in federal court, they nonetheless were more than sufficient to put Trooper Macaluso—and any other reasonable officer in his position—on notice that he was likely violating Diamondstone's constitutional rights.

Macaluso alleges, however, that it was reasonable for him to think that his actions were lawful since (a) he had sought the advice of his superiors, who encouraged him to keep ticketing Diamondstone and (b) he had conferred with the traffic court hearing officer on the reason for the dismissal of the citations and as to what the hearing officer would require of him in order for a citation to be upheld.

We are unpersuaded by Macaluso's first argument. The traffic court ruled multiple times on the issue of whether the 1991 stops were sufficient to create probable cause to stop Diamondstone in 1992. On each of these occasions, the court concluded firmly and unequivocally that they were not sufficient. These rulings were not contradicted, let alone overturned, by any other court of competent authority. And Macaluso was fully aware of these rulings. Under the circumstances, a reasonable individual in Macaluso's position would not be entitled to ignore the rulings of the traffic court, regardless of what his superior officers told him.

As for Macaluso's second contention, we are unsure precisely what he is arguing. If his claim is that he talked to the traffic court hearing officer and that his later actions were part of a good faith effort to comply with the traffic court's instructions, that could provide some support for his claim of qualified immunity. On the record before us,

it is hard to see how Macaluso's actions were anything but outright defiance of the traffic court's orders. But it is possible that Macaluso is alluding to some other interactions with the traffic court that have not been brought to our attention on appeal. Accordingly, rather than deciding the issue of Macaluso's qualified immunity ourselves, we believe the question is best considered by the district court on remand.

### ii. Prior, Stanton, and Walton

 The district court concluded that Prior, Stanton, and Walton were entitled to qualified immunity. The court's holding followed from its finding that Trooper Macaluso's stops were supported by reasonable suspicion. If he did not violate the law, their inaction surely was protected. But we have determined that Macaluso's stops were not supported by reasonable suspicion. Diamondstone has alleged that he informed Prior, Stanton, and Walton of the traffic court's rulings that negated reasonable suspicion. Diamondstone further claims that despite this knowledge, these defendants did nothing to stop Macaluso from harassing him, and indeed encouraged Macaluso to continue to pull him over.

If Diamondstone's assertions are true, these officials are no more entitled to qualified immunity than is Macaluso himself. But on the record before us, it is unclear whether these individuals accept Diamondstone's account of their involvement in the incidents giving rise to this lawsuit. Accordingly, we remand Diamondstone's claims against Prior, Stanton, and Walton, to the district court, with instructions to that court to determine the scope of their involvement in this case, and whether the issues as to them give rise to fact questions that must be resolved by a jury.

\* \* \*

The district court's grant of summary judgment to defendant Macaluso on Diamondstone's claims that his Fourth Amendment rights were violated by traffic stops 3–10 and 12 is REVERSED. These claims are REMANDED to the district court for a determination of qualified immunity and, if no such immunity exists, damages.

The judgment in favor of Macaluso on Diamondstone's malicious prosecution claim is VACATED and REMANDED for a new trial.

The court's finding that defendants Prior, Stanton, and Walton are entitled to qualified immunity is VACATED. The claims against them are REMANDED for a determination of the scope of their involvement in the events giving rise to this suit, both for purposes of qualified immunity and of possible liability.

The judgment is AFFIRMED in all other respects.