UNITED STATES of America,
Plaintiff-Appellee,

v.

Don Benny ANDERSON,
Defendant-Appellant.

No. 83-1276.

United States Court of Appeals,
Seventh Circuit.

Argued May 25, 1983.

Decided Aug. 30, 1983.

Wayne T. Schoenberg, Hannegan, Knight, Stokes, Schoenberg & Weber, St. Charles, Ill., for defendant-appellant.

Frederick J. Hess, Asst. U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before WOOD and CUDAHY, Circuit Judges, and WYATT, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant-appellant Don Benny Anderson appeals his conviction of two counts of violating the Hobbs Act, 18 U.S.C. § 1951, in connection with his abortion protest-related abduction of an Illinois doctor and his wife, arguing that the district court erred in denying defendant's motion for judgment of acquittal on the basis of insufficient evidence; that his Sixth Amendment rights were infringed by the court's refusal to permit defendant and his counsel to alternate in conducting his defense; and that the court erred in denying two of his proffered jury instructions. We affirm.

I.

Dr. Hector Zevallos and his wife, Rosalie Zevallos, live in Edwardsville, Illinois. Dr. Zevallos practices medicine both at the TriCity Obstetrics Center and at the Hope Clinic for Women, both located in Granite City, Illinois; the latter facility renders medical services, including abortions. Patients travelled from other states to Illinois for treatment at the Hope Clinic, and the clinic purchased and had shipped to it products from medical and office supply companies located outside of the state.

On the evening of August 12, 1982, defendant and two other men forcibly abducted Dr. Zevallos and his wife from their home at gunpoint, having gained entrance to their home on the pretense of responding to a real estate advertisement. Dr. Zevallos was told initially by the men that they sought only money, and indeed defendant and his assistants did take over three hundred dollars from the couple. The victims were handcuffed, blindfolded and driven to a remote and isolated bunker near Illiopolis, Illinois, where they were held captive in spartan conditions for eight days. During the first two days of captivity, the abductors spoke only of the victims' money and how it could be obtained. But shortly thereafter, defendant told Dr. Zevallos that he and his helpers were members of the Army of God, an anti-abortion group, and that Dr. Zevallos had been abducted because of his connection with the Hope Clinic. Defendant asked Dr. Zevallos to tape a message to President Reagan requesting legislation banning abortion. When Dr. Zevallos refused to cooperate and was in turn told that he would be executed if he failed to do so, Dr. Zevallos made the tape.

Dr. and Mrs. Zevallos both testified that during the entire period of their captivity, they constantly feared death at the hands of their captors. Toward the end of the abduction, one of the defendant's helpers told the victims that he would have to kill them, and on the last day, the victims were taken outside the bunker, where Mrs. Zevallos relayed to her husband the helper's earlier statement that he would have to kill them if Dr. Zevallos did not agree to cease performing abortions. She asked her hus-

* The Honorable Inzer B. Wyatt, Senior District Judge for the Southern District of New York, is sitting by designation.

band to so stipulate, a request to which he assented; his captor's response was to express relief that they need not be executed after all, but to caution that the doctor would have to convince defendant of his sincerity to be sure that his life would be spared. Dr. Zevallos repeated his affirmation to defendant.

In the course of transporting the victims by car from the bunker, defendant stopped suddenly and demanded that Dr. Zevallos close the Hope Clinic immediately. When Dr. Zevallos equivocated, defendant threatened to take the victims back to the bunker, a threat which led Dr. Zevallos to believe he would be killed at that moment. However, defendant continued to drive and released the victims along a highway near their home.

After a jury trial, defendant was convicted under 18 U.S.C. § 1951 of conspiracy and attempt to obstruct, delay and affect interstate commerce (*i.e.*, that commerce connected with all or some of the Hope Clinic's business) through extortionate means, and was sentenced to a total of thirty years incarceration. From that judgment, defendant appeals.

## II.

### A. *The Proposed Limiting Instruction*

At the close of the evidence, the jury was instructed, in accordance with the Seventh Circuit Federal Court Pattern Jury Instructions § 2.02, as follows:

The defendant is charged with the crimes of attempting to obstruct commerce by extortion and conspiring to obstruct commerce by extortion. The defendant has denied that he is guilty of the charges.

Defendant now protests that the trial court erred in refusing to submit to the jury his proffered instruction which stated,

The Defendant is charged only with the crimes of attempting to obstruct commerce by extortion and conspiracy to obstruct commerce by extortion.

The Government has attempted to show that Dr. and Mrs. Zevallos were kidnapped and that while they were being held money was taken from them.

You are not to concern yourself with the question of whether the Defendant in this case is guilty of kidnapping or stealing. Those questions are not issues in this case.

Defendant points to Fed.R.Evid. 105 which states,

When evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the Court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

Although conceding that the evidence here of kidnapping and robbery was properly admitted under Fed.R.Evid. 403, defendant argues that the district court erred in not tendering to the jury defendant's proposed caveats as to the limited permissible use of such evidence, which overlapped with evidence of the crime actually charged.

 Rule 105, however, does not require that every cautionary instruction proffered by the defendant be actually given. Weinstein & Berger, 1 *Evidence* 105[5] at 105–34. This is so especially where adequate protection is afforded by other portions of the charge. *United States v. Cina*, 699 F.2d 853, 863–64 (7th Cir.1983). Here, the instruction actually given fully focused the jury's attention on the sole issue in the case: whether there was evidence beyond a reasonable doubt that the defendant attempted or conspired to obstruct commerce by extortion. Accordingly, a list of crimes with which defendant was not charged would be superfluous. But refusal of the instruction was an especially felicitous exercise of the trial court's discretion here as, in its proffered form, the instruction was not only superfluous, but potentially confusing as well. It first states that the government "attempted to show that [the victims] were kidnapped . . .," but that statement could easily have misled a juror into erroneously believing that the government attempted to prove a separate case of federal kidnapping. The instruction is further potentially misleading in its admonition that the jury is

not to concern itself "with the question of whether the Defendant in this case is guilty of kidnapping.... Those questions are not issues in this case ...;" such language may conversely have erroneously suggested to the jury that the occurrence of violent abduction, even as a means of coercing Dr. Zevallos' future activities, was not an issue in the case. In short, the proffered instruction added little to the existing charge and contained great potential for mischief. Under such circumstances, it was properly refused.

▪ Moreover, even if it were somehow error to refuse this instruction, we think the record establishes that such an error would have resulted in no prejudice to the defendant. The events of the trial make clear that the Hobbs Act, and not the elements of kidnapping, was the focus of the case throughout: the government began its case by eliciting from its first two witnesses the interstate commerce ties of the Hope Clinic; throughout, the government, as well as the trial court and the defendant, sedulously avoided the use of the term "kidnapping" to describe the events, preferring the term "abduction;" and the cross-examination focused extensively on the actual threats independent of the kidnapping itself. Thus, even if we were to find the actual instructions inadequate as a matter of semantics, in context they adequately clarified the permissible uses of the evidence.

### B. *Participation in Cross-Examination*

▪ The defendant next argues that his Sixth Amendment right to represent himself was infringed by the trial court's refusal to permit him to alternate conduct of his defense with his attorney; specifically, defendant sought to conduct cross-examination of the Zevalloses, while leaving the bulk of the remainder of the proceedings to his attorney. However, in line with the Supreme Court's determination that the right to counsel and the right to self-representation are separate and independent guarantees under the Sixth Amendment, *Gannett Co. v. Depasquale*, 443 U.S. 368,

417–18, 99 S.Ct. 2898, 2924–25, 61 L.Ed.2d 608 (1978); *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), this court has squarely held that such "hybrid" representation as defendant proposed here is not an option secured by the Sixth Amendment. *United States v. Trapnell*, 638 F.2d 1016, 1026–27 (7th Cir. 1980). But in any event in these circumstances, where defendant considered his attorney "very effective" and, the record discloses, was able to confer repeatedly with his attorney in the course of the trial, we decline to overrule our previous holding in · *Trapnell.*

### C. *The Nullification Instruction*

The defendant contends that the trial court erred in refusing his proffered instruction which read,

The jury has the power to decide, according to its own judgment and conscience, all questions of law and fact involved in the issue of guilty or not guilty.

Juries may apply matter [sic] of fact and law together, and form their consideration of, and right judgment upon, both.

Jurors may not be punished for voting for acquittal under any circumstances.

Such an instruction was warranted, defendant argues, in order to advise the jury of its right to acquit as the "community conscience" in a case involving potentially highly politicized events. Citing *United States v. Dougherty*, 473 F.2d 1113 (D.C.Cir. 1972), the defendant urges that "[t]he power of a jury to pronounce a nullification of a proceeding before it is more than a power; it is a right. Like other rights, it becomes meaninglessly diluted when its holder is unaware of his or her authority."

▪ This pronouncement, however, does not accurately state the law. A learned discussion by Judge Leventhal of the historical origins and evolution of the "community conscience" or nullification verdict in Anglo-American jurisprudence is contained in *Dougherty*, 473 F.2d at 1130–37. That discussion concludes with the accepted view that, while the "community conscience" ver-

dict is to be accepted as a natural and at times desirable aberration under our system, it is not to be positively sanctioned by instructions, such as defendant's, which would encourage a jury to acquit "under any circumstances" regardless of the applicable law or proven facts. 473 F.2d at 1137. We agree with Judge Leventhal's capsulization of the necessary historical tension which is not to be collapsed by explicit nullification instructions:

> This requirement of independent jury conception confines the happening of the lawless jury to the occasional instance that does not violate, and viewed as an exception may even enhance, the over-all normative effect of the rule of law. An explicit instruction to a jury conveys an implied approval that runs the risk of degrading the legal strictures requisite for true freedom, for an ordered liberty that protects against anarchy as well as tyranny.... The jury system provides flexibility for the consideration of interests of justice outside the formal rules of law. This embraces whatever extra the defendant conveys by personal representation, whether through demeanor or sincerity of justification. But it is subject to the overriding consideration that what is tolerable or even desirable as an informal, self-initiated exception, harbors grave dangers to the system if it is opened to expansion and intensification through incorporation in the judge's instructions.

*Id. Dougherty,* then, states the prevailing view that tacit toleration of jury verdicts of innocence, in apparent contradiction to clear proof of guilt, affords adequate protection to the "conscience" function of the jury, and that explicit instructions sanctioning such action pose too great a threat to the rule of law. *Accord, United States v. Simpson,* 460 F.2d 515, 519–20 (9th Cir. 1972). In urging reversal on the basis of his refused nullification instruction, defendant would have us upset a carefully and painstakingly developed jurisprudential balance in this delicate and potentially explosive area. We decline to do so.

#### D. *Sufficient Evidence*

Defendant finally argues that the district court erred in refusing his motion for acquittal at the close of the evidence. He contends that the evidence adduced at trial supported, at most, a finding of threats directed towards the making of the tape, but not towards the obstruction of interstate commerce, *i.e.,* the cessation of abortion-related activities at the Hope Clinic. We cannot agree.

At the very least, the evidence showed that, at two points in the abduction, defendant's threats had an intended potential impact on interstate commerce. The first such incident was the defendant's threat, conveyed and attributable to him through one of his coconspirators, that unless Dr. Zevallos could convince defendant of his sincerity in promising to cease performing abortions, he and his wife would be killed. The second incident occurred in the course of the couple's deliverance from the bunker, when defendant abruptly stopped the car and demanded that Dr. Zevallos close the Hope Clinic. This demand was backed up by a threat to return to the bunker, a threat which quite obviously implied the continuation of the previous week's humiliation, violent restraint, and threats of death. No clearer relationship between the threats and the interstate commerce-related results sought by the defendant could be imagined.

For the foregoing reasons, defendant's convictions of attempt and conspiracy under 18 U.S.C. § 1951 are

AFFIRMED.