UNITED STATES of America,
Appellee,

v.

**John ARENA and Michelle Wentworth,
Defendants–Appellants.**

Nos. 97–1081(L), 97–1082(C).

United States Court of Appeals,
Second Circuit.

Argued Dec. 10, 1998.

Decided June 7, 1999.

---

John G. Duncan, Assistant United States Attorney, Syracuse, New York (Thomas J. Maroney, United States Attorney for the Northern District of New York, Syracuse, New York, on the brief), for Appellee.

Stasia Zoladz Vogel, Derby, New York, for Defendant–Appellant John Arena.

Carl F. Guy, Syracuse, New York, for Defendant–Appellant Michelle Wentworth.

Vincent P. McCarthy, New Milford, Connecticut, for Amicus Curiae American Center for Law and Justice, in support of Defendants–Appellants.

Before: KEARSE and STRAUB, Circuit Judges, and MURTHA, Chief District Judge*.

KEARSE, Circuit Judge:

Defendants John Arena and Michelle Wentworth appeal from judgments entered in the United States District Court for the Northern District of New York after a jury trial convicting each on two counts of extortion and one count of conspiracy to commit extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951 (the "Act"), on account of their attacks on medical facilities that provided reproductive health services. Arena and Wentworth were sentenced principally to 41 and 37 months' imprisonment, respectively, to be followed by three years of supervised release, and were ordered jointly and severally to pay restitution in the amount of $52,062.11. On appeal, they contend principally that the Hobbs Act was not applicable because the government failed to prove (a) that their actions affected interstate commerce and (b) that they thereby obtained property through the wrongful use of violence, force, or fear. For the reasons that follow, we reject all of their contentions and affirm.

## I. BACKGROUND

The present prosecution arises out of two instances in which butyric acid was poured in the premises of upstate New York medical facilities that provided a variety of reproductive health services, including abortions. Butyric acid is a hazardous liquid that emits a powerful, rancid odor. Exposure to its fumes can cause irritation to the eyes and respiratory tract; ingestion of the liquid can cause burns to

---

* Honorable J. Garvan Murtha, of the United States District Court for the District of Vermont, sitting by designation.

the gastrointestinal tract; and contact with the liquid can cause severe burns to the skin and eyes. Arena and Wentworth, longtime anti-abortion activists, were tried and convicted in a New York state court on a variety of charges in connection with those incidents. The present federal prosecution followed.

At the trial in the present case, the government's evidence was presented principally through the testimony of victims of the attacks, law enforcement and public health officials, and cooperating witness Michelle Campbell, the person who poured the butyric acid in the medical facilities. Taken in the light most favorable to the government, the evidence at the federal trial revealed the following.

## A. The Butyric Acid Attacks

In the early 1990s, Wentworth was the chairperson of the Auburn Right to Life Movement, based in Auburn, New York, and was an active member of the national anti-abortion protest group called Operation Rescue. Arena was a member of Operation Rescue and of the Central New York Right to Life Federation, as well as of another anti-abortion group known as the Lambs of Christ. Campbell was Wentworth's daughter.

In early 1994, Wentworth informed Campbell that certain of Wentworth's associates in the anti-abortion protest movement were interested in having butyric acid infused in various medical facilities that provided abortions. In March 1994, Wentworth told Campbell that Arena was willing to pay to have the acid poured inside such facilities, at the rate of $100 per facility. After Campbell indicated her interest, Wentworth arranged a meeting with Arena.

### 1. The Events of April 1994

Arena, Wentworth, and Campbell met on April 13, 1994, at the home of Wentworth and Campbell in Auburn. Arena confirmed that he was willing to pay Campbell to pour butyric acid in targeted clinics, and he proposed that she start with the nearby Planned Parenthood Center of Syracuse ("Planned Parenthood"). After Campbell agreed, Arena provided her with latex gloves, mouthwash that he claimed would eliminate any traces of odor that might be left on Campbell's hands after pouring the acid, and a large bottle of butyric acid. Arena instructed Campbell to pour the acid inside Planned Parenthood during business hours, so that the odor would force the facility to close; Wentworth suggested that the acid be poured into the ventilation system so that the odor would permeate the facility and force it to remain closed for several days.

The three arranged that Campbell, after pouring the acid, would call Wentworth, who would then inform Arena as to Campbell's success; Arena would then send them a check for $100. Wentworth transferred part of the acid from the large bottle brought by Arena into a smaller, 16-ounce bottle and gave the latter to Campbell. Wentworth stored the remaining acid in her garage.

That night, Campbell went to Syracuse and stayed in a motel. On the morning of April 14, Wentworth paged her at the motel to make sure she still intended to carry out the attack, and Campbell confirmed that she did. Campbell—carrying the butyric acid and other supplies in her handbag—then went to Planned Parenthood and indicated to the receptionist that she wished to purchase condoms. After the receptionist directed Campbell to a location in the clinic where condoms were sold, Campbell entered a restroom, where she opened the bottle Wentworth had given her and poured its contents onto a wall and into a heating duct.

Campbell then set the restroom door to lock automatically upon closing, left the restroom, and exited the building. She discarded her handbag and its contents—including the bottle that had contained the acid—in a trash bin and called Wentworth to report. Wentworth immediately re-

layed word to Arena that the acid had been poured. Two days later, a check for $100, signed by Arena, arrived at the home of Wentworth and Campbell.

Meanwhile, shortly after Campbell left Planned Parenthood, a foul smell spread throughout the facility. Campbell herself described the smell of butyric acid as "horrible" and "disgusting." (Trial Transcript ("Tr.") 541.) The odor was described by Planned Parenthood employees as "incredibly overpowering" (Tr. 294), "noxious" (Tr. 267), "incapacitating" (Tr. 273), and akin to "vomit" (Tr. 261). Planned Parenthood Executive Director Jeffrey Gilbert immediately suspected butyric acid, as he was aware that other Planned Parenthood affiliates had been the targets of similar attacks and as employees of those affiliates had described the acid's odor to him. Indeed, Gilbert testified that he had taken certain steps to prepare for a possible butyric acid attack, including locating an environmental cleanup firm. The odor became progressively more intense, and within some 15 minutes the fire department evacuated the facility of the approximately 30 employees and 10 patients then present. The fire department conducted chemical testing and identified the source of the odor as butyric acid.

As a result of the release of butyric acid in its facility, Planned Parenthood was forced to close for the remainder of the day and to initiate a long and costly cleanup effort. The clinic attempted to resume partial operations the next day, but closed again when the continued noxious odor caused Gilbert to fear for the safety of patients and staff. Resumption of partial operations was delayed for several days; the environmental contractor remained on the premises for more than a week, cleaning all exposed surfaces and removing, *inter alia,* ventilation ducts, flooring, bathroom fixtures, ceiling tiles, draperies, and carpeting, all of which had been contaminated by exposure to the butyric acid and its fumes. Normal operations at the clinic were not resumed until some 10 days after the attack.

The effects of the acid attack were felt well beyond Planned Parenthood's physical plant. A number of the persons evacuated experienced headaches, nausea, and other physical effects from exposure to fumes. A professional counselor was brought in to meet with clinic personnel, who reported feelings of anger, fear, dread, and vulnerability. Numerous patients informed Planned Parenthood that they were afraid to visit that facility because of the acid attack; they requested possession of their medical records and indicated that they would seek medical services elsewhere. In light of the fears of patients and staff, Planned Parenthood made several changes to its facilities and security procedures, including hiring a full-time armed guard.

2. *The Events of May 1994*

Following the butyric acid attack on the Planned Parenthood facility, Wentworth and Campbell discussed plans for similar attacks on the facilities of other upstate New York abortion providers. In May 1994, Campbell agreed to return to the Syracuse area to make such an attack on the private offices of Dr. Jack E. Yoffa, a provider of abortion services who had been the target of numerous anti-abortion protests attended by Arena and Wentworth. Wentworth provided Campbell with a car, a hand-drawn map, and pictures of Yoffa's building, as well as the butyric acid and other supplies needed for the attack.

On May 19, Campbell arrived at Yoffa's offices and asked to use a restroom; she was admitted into a secured area, separated from the reception area by a locked door. She eventually found a restroom but was unable to locate a suitable vent; she therefore poured the butyric acid on the floor.

Campbell left the facility and, after discarding her latex gloves, the empty bottle, and a plastic bag in a nearby wooded area, returned to Auburn. She described the events to Wentworth, who relayed the in-

formation to Arena. Arena again sent a check, this time in the amount of $135. The extra $35 was a bonus to Campbell for having poured the acid on the very day that Yoffa was scheduled to receive an award.

The acid attack on Yoffa's offices had effects similar to those experienced by Planned Parenthood. As Campbell exited Yoffa's offices, staff members began to smell a strong, putrid odor, again likened to "vomit," which rapidly became intense and "overpowering." (Tr. 441.) Several dozen patients and employees had to be evacuated from the facility. Again the impact of the acid attack was extensive. The environmental contractor hired to clean Yoffa's offices worked at the site for approximately one month. Though Yoffa resumed operations, the noxious odor was never completely removed. A number of the persons evacuated experienced headaches, sore throats, nausea, and dizziness, and clinic personnel continued to experience those symptoms, as well as adverse psychological effects, for several weeks thereafter. Numerous patients refused to return to Yoffa's offices and requested that their medical records be transferred to other providers. The attack made staff members fearful for their safety and led one long-time employee to resign.

Yoffa instituted additional security measures. They included installing bulletproof glass and panic buttons in the reception area, providing personal security devices for clinic staff members to carry as they walked to their cars, and installing a remote starting device in his own car.

B. *The Local Investigation and State Court Proceedings*

In the weeks following the attack on Yoffa's offices, local law enforcement officials developed a profile and composite sketch of the young woman suspected of pouring the butyric acid at both facilities. Their efforts led them to Campbell, and she was arrested in June 1994. Campbell agreed to cooperate with the police, and she provided a detailed statement describing her agreements with Arena and Wentworth and the manner in which she had carried out the acid attacks at their behest. She also disclosed where she had discarded the butyric acid bottle she had taken into Yoffa's offices; that bottle was subsequently recovered by the police.

On the day Campbell was arrested, a search warrant was executed for the home she shared with Wentworth. There the police recovered, *inter alia,* a number of buttons bearing the words "Yoffa kills children" and a photograph of Yoffa's personal residence. A warrant was also obtained for Arena's home, and a search of those premises yielded, *inter alia,* a handwritten note containing the words "butyric acid."

Arena and Wentworth were arrested, and each was charged in state court with two felony counts of criminal mischief, in violation of N.Y. Penal Law § 145.10 (McKinney 1999); one misdemeanor count of conspiracy, in violation of *id.* § 105.05(1) (McKinney 1998); and two misdemeanor counts of endangering public safety, in violation of N.Y. Envtl. Conserv. Law § 71–2711(3) (McKinney Supp.1999). Campbell entered into a plea agreement with local authorities, pursuant to which she pleaded guilty to a state-law charge of felony conspiracy for her role in the two acid attacks and was sentenced to five years' probation; she agreed to testify against Arena and Wentworth.

Arena pleaded guilty to all counts; Wentworth proceeded to trial, at which Campbell testified. The public endangerment charges were withdrawn before the case was submitted to the jury; Wentworth was found guilty on the remaining counts. In February 1995, Arena and Wentworth were sentenced principally to five years' probation.

C. *The Federal Prosecution*

Shortly after the state-court sentencing, the United States Attorney for the Northern District of New York, viewing the

state proceeding as inadequate to vindicate the federal interest in protecting the rights of citizens to obtain reproductive health services free from threats of force and violence, sought and received permission from the United States Department of Justice to bring the present federal prosecution against Arena and Wentworth. Each was indicted on one count of conspiring to obstruct interstate commerce and two counts of obstructing interstate commerce by committing extortion, in violation of the Hobbs Act, 18 U.S.C. §§ 1951 and 2.

Prior to trial, Wentworth moved for dismissal of the indictment on the grounds, *inter alia*, that the federal prosecution constituted double jeopardy in violation of her Fifth Amendment rights, *see* Part II. D.1. below, and that the Hobbs Act was not applicable, as her actions amounted only to "purely local crimes" with no effect on interstate commerce (Affirmation of Carl F. Guy in Support of Motion to Dismiss, dated May 16, 1995, at 1). The motion was denied, and the case proceeded to trial.

The evidence at trial included testimony as to the events described above. In addition, as discussed in greater detail in Part II.A. below, Gilbert and Yoffa testified that their medical facilities served patients from states other than New York and purchased supplies from out-of-state vendors. Defense motions for acquittal were denied, and the jury found Arena and Wentworth guilty on all counts. Defendants were sentenced as indicated above, and these appeals followed.

## II. DISCUSSION

On appeal, Wentworth argues principally that the government's evidence was insufficient to support a conviction under the Hobbs Act; Arena makes a similar argument in contending that he was denied the effective assistance of counsel, *see* Part II.C.1. below. Defendants also raise other issues, including claims of double jeopardy, challenges to certain instructions and evidentiary rulings, and a contention that the

district judge should have recused himself. We conclude that none of their contentions has merit.

A. *The Hobbs Act: Effect on Interstate Commerce*

■ The Hobbs Act provides that

[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section

shall be fined, or imprisoned, or both. 18 U.S.C. § 1951(a). In a Hobbs Act prosecution, proof that "commerce [wa]s affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference." *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Defendants contend that the government's evidence was insufficient to show that their conduct had an effect on interstate commerce. We disagree.

■ Although robbery, violence, extortion, and threats of such conduct are not within the scope of the Hobbs Act absent a nexus with interstate (or foreign) commerce, the Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce." *Stirone v. United States,* 361 U.S. at 215, 80 S.Ct. 270; *see also Evans v. United States,* 504 U.S. 255, 263 n. 12, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992); *United States v. Daley,* 564 F.2d 645, 649 (2d Cir.1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978). Since the Act prohibits the specified conduct if it affects commerce "in any way or degree," 18 U.S.C. § 1951(a), it is well established that the burden of proving such a nexus is *"de minimis," United States v. Farrish,* 122 F.3d 146, 148 (2d Cir.1997), *cert. de-*

*nied,* —— U.S. ——, 118 S.Ct. 1056, 140 L.Ed.2d 118 (1998). "The jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce.... Even a potential or subtle effect on commerce will suffice." *United States v. Angelilli,* 660 F.2d 23, 35 (2d Cir.1981), *cert. denied,* 455 U.S. 945,. 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982); *see, e.g., Jund v. Town of Hempstead,* 941 F.2d 1271, 1285 (2d Cir.1991) ("any interference with or effect upon interstate commerce, whether slight, subtle or even potential ... is sufficient to uphold a prosecution under the Hobbs Act"). Similarly, in a prosecution for Hobbs Act conspiracy, "all that need be shown is the possibility or potential of an effect on interstate commerce, not an actual effect." *United States v. Jones,* 30 F.3d 276, 285 (2d Cir.) (Hobbs Act jurisdiction may be established by proof of interference "in any manner whatever with interstate commerce, even when the effect of such interference or attempted interference ,is minimal"), *cert. denied,* 513 U.S. 1028, 115 S.Ct. 602, 130 L.Ed.2d 513 (1994).

Wentworth's contention that *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), altered these principles is erroneous. In *Lopez,* the Supreme Court ruled only that the Gun–Free School Zones Act, 18 U.S.C. § 922(q)(1)(A), by which Congress sought to regulate gun possession in the vicinity of schools without regard to whether individual instances of gun possession were connected in any way to interstate commerce, went beyond Congress's power under the Commerce Clause. *See* 514 U.S. at 567–68, 115 S.Ct. 1624. We have held that "*Lopez* did not raise the jurisdictional hurdle for bringing a Hobbs Act prosecution," that is, that *Lopez* "did not alter the long-standing rule that the Government need only demonstrate a *de minimis* effect upon commerce in order to establish jurisdiction under the [Hobbs] Act." *United States v. Farrish,* 122 F.3d at 147, 148; *see also United States v. Leslie,* 103 F.3d 1093, 1100 (2d Cir.) ("Since *Lopez,* courts interpreting the Hobbs Act ... have continued to hold that *Lopez* did not affect this *de minimis* standard."), *cert. denied,* 520 U.S. 1220, 117 S.Ct. 1713, 137 L.Ed.2d 837 (1997).

Further, the government need not prove that it was the defendants' purpose to affect commerce; it suffices that their conduct had that natural effect. *See, e.g., United States v. Daley,* 564 F.2d at 649; *United States v. Varlack,* 225 F.2d 665, 672 (2d Cir.1955). Thus, the

> requisite impact on interstate commerce has ... been found where the resources of a business engaged in interstate commerce are diminished by extortion, thereby permitting the inference that as a consequence of the extortion the operations of the business have been delayed, obstructed or in some way affected.

*United States v. Daley,* 564 F.2d at 649; *see also United States v. Farrish,* 122 F.3d at 149 (interstate commerce element proven by evidence that robbed garage, located near interstate portals, "regularly served cars bearing out-of-state license plates," permitting inference that the robberies might discourage out-of-state business); *United States v. Jones,* 30 F.3d at 285–86 (interstate commerce affected by robbery of $9,000 from narcotics buyer, depleting his assets and thereby limiting his ability to make future purchases of cocaine, "a commodity that travels in interstate commerce"); *United States v. Calder,* 641 F.2d 76, 78 (2d Cir.) (commerce requirement satisfied where victimized restaurant purchased non-alcoholic wine from Canada), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981); *United States v. Anderson,* 716 F.2d 446, 447, 450 (7th Cir. 1983) (interstate commerce requirement satisfied where numerous patients of victim abortion provider came from other states and where provider bought medical supplies from out-of-state companies).

In reviewing a sufficiency challenge, we consider pieces of evidence not

in isolation but in conjunction, *see, e.g.,* *United States v. Miller,* 116 F.3d 641, 676 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998); *United States v. Rea,* 958 F.2d 1206, 1221 (2d Cir.1992), and we "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility," *United States v. Allah,* 130 F.3d 33, 45 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2347, 141 L.Ed.2d 718 (1998); *see* *United States v. Amiel,* 95 F.3d 135, 141 (2d Cir.1996); *United States v. Rea,* 958 F.2d at 1221. These principles apply whether the evidence being reviewed is direct or circumstantial. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

■ The government's evidence in this case was more than sufficient to show the requisite impact on commerce. Gilbert testified that some of Planned Parenthood's patients came from outside of New York, principally from Pennsylvania. He also testified that Planned Parenthood purchased

> medications and supplies from a number of out-of-state manufacturers. Most methods of birth control come from out-of-state suppliers. All of our birth control pills, as well as the contraceptive method known as Depo–Provera, which is the contraceptive injection, all of that comes from out of state. We purchase condoms from out of state and a variety of consumable supplies. Our rubber gloves come from out of state. Pregnancy tests are manufactured out of state.

(Tr. 290.) Gilbert testified that Planned Parenthood's expenditures for supplies coming from out of state were "probably well over a hundred thousand dollars. Contraceptives alone cost us close to $100,-000, and almost all of them are purchased out of state." (Tr. 291–92.) Yoffa similarly testified that he had 40–50 patients from out of state; most were from states contig-

uous to New York, and some came from as far away as Florida and California. He testified that about 25 percent of all of his supplies came from out of state. The government introduced lists provided by Gilbert and Yoffa of the names and locations of out-of-state vendors from which Planned Parenthood and Yoffa, respectively, purchased supplies.

The government also introduced evidence that numerous patients of both facilities had their appointments cancelled by reason of the butyric acid attacks and that in the wake of the attacks other patients refused to return for medical services. Yoffa testified, for example, that in the three months following the attack on his offices, gross receipts were lower by some $18,000 to $20,000 a month. Further, both facilities would normally have used supplies of out-of-state origin during medical visits by the patients whose appointments were cancelled or who refused to return; the reduced number of patients thus reduced the facilities' need to purchase such supplies. In addition, both facilities incurred substantial expenses as a result of the acid attacks, thereby suffering a diminution of resources that could affect their ability to purchase such supplies.

The jury, properly instructed in accordance with the above Hobbs Act principles, was entitled to infer from the evidence that some of the patients affected by the acid attacks were residents of states other than New York and that the attacks potentially affected the facilities' purchases of supplies in interstate commerce. We conclude that the government presented sufficient proof of the interstate commerce element.

### B. *The Hobbs Act: Obtaining Property by Unlawful Means*

Wentworth also challenges the applicability of the Hobbs Act to defendants' conduct, focusing principally on the term "extortion," which is defined in the Act as

the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951(b)(2). Wentworth contends that no Hobbs Act violation was proven, arguing principally that Planned Parenthood and Yoffa did not "consent" to part with "property" as a result of fear because the acid attacks and the facilities' temporary closings were not preceded by any threat; and that defendants did not "obtain[ ]" the facilities' property and were not motivated by the prospect of economic gain. These arguments misperceive the scope of the Act.

### 1. *"Property"*

■ The Hobbs Act, by its terms, encompasses violence against property. *See* 18 U.S.C. § 1951(a) (commission or threat of physical violence against persons "or property"); *United States v. Zappola,* 677 F.2d 264, 268 (2d Cir.), *cert. denied,* 459 U.S. 866, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982) (noting that common understanding of extortion includes injury to property); 91 Cong. Rec. 11,845 (1945) (Act designed to penalize acts of "violence to personal property"). The concept of "property" under the Hobbs Act is an expansive one. *See, e.g., Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 101 (2d Cir. 1990); *United States v. Tropiano,* 418 F.2d 1069, 1075 (2d Cir.1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970). While often the property involved is an existing physical asset, the concept is not limited to tangible things, but includes intangible assets such as rights to solicit customers and to conduct a lawful business. *See, e.g., United States v. Margiotta,* 688 F.2d 108, 134 (2d Cir.1982) (continuation of insurance business), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Daley,* 564 F.2d at 648 (employees' jobs and contractors' future job assignments); *United States v. Tropiano,* 418 F.2d at 1075–76 (right to do business in a given area or to bid for contracts); *United States v. Anderson,* 716 F.2d at 450 (right of doctor to continue to perform abortions).

> The definition of "property" under the Hobbs Act is admittedly expansive.... "[P]roperty" under the Act "includes, in a broad sense, any valuable right considered as a source or element of wealth," including "a right to solicit business." *United States v. Tropiano,* 418 F.2d [at] 1075–76 ...; *see also Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342, 1350 (3d Cir.), ("Rights involving the conduct of business are property rights."), *cert. denied,* [493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210] (1989).

*Town of West Hartford v. Operation Rescue,* 915 F.2d at 101.

In accordance with these principles, the district court instructed the jury, without objection, that "the term 'property' as used in these instructions means money or anything of value. The term 'property' is not limited to tangible, physical items and includes the right to conduct a business free from wrongful force, coercion or fear" (Tr. 945–46), and that, as a matter of law, "the business of rendering reproductive healthcare services engaged in by Planned Parenthood Center and Dr. Jack Yoffa constitutes 'property' within the definition of Section 1951" (Tr. 946).

■ Although Wentworth states in her brief on appeal that she does not dispute the propriety of interpreting property as "the right to conduct a lawful business free from threats and violence" (Wentworth brief on appeal at 31 (internal quotation marks omitted)), she appears to focus her arguments instead solely on "physical damage to the facilit[ies] resulting in clean-up and other costs, and lost revenues" (*id.* at 34). She suggests that, under *Town of West Hartford v. Operation Rescue,* proof of the latter losses does not suffice to show that she obtained "property" belonging to the attacked facilities.

Wentworth's reliance on *Town of West Hartford v. Operation Rescue* is misplaced. Although that case, like this one, involved protests against a health care facility that provided abortions (the "clinic" or the "Center"), *see* 915 F.2d at 94 (defendants sought "to close down the Center and prevent the performance of abortions"), that case was neither a criminal prosecution nor a civil case in which the plaintiff was the facility. Rather, the civil plaintiff was the municipality in which the clinic was located, and the "property" of which the municipality claimed to have been deprived was the municipality's " 'less diligent or softened response' " to the disturbances caused by the protestors, *id.* at 96 (quoting complaint), " 'the hinderance [*sic*] of normal routine police activities within the Town of West Hartford[, and] the cost of increased manpower and equipment needed to respond to the illegal activities,' " *id.* at 98 (quoting plaintiff's "Response to RICO Case Order"). We ruled that governmental response to unlawful acts is not "property" within the meaning of the Hobbs Act. *See id.* at 101–02 (neither "altered official conduct," such as the dismissal of criminal charges, nor the expenditure of public funds for police overtime, constitutes property within the meaning of the Act). In light of the breadth of the concept of property, we "[a]ssum[ed] *arguendo* " that interference with the clinic's operations constituted interference with the property of the clinic, *id.* at 102, and in ordering the municipality's claims dismissed we noted that we had "not considered the sufficiency of the Center's claims," *id.* at 105. As quoted above, *Town of West Hartford v. Operation Rescue* noted that the broad concept of property under the Hobbs Act includes "[r]ights involving the conduct of business." *Id.* at 101 (internal quotation marks omitted). Accordingly, that case does not justify Wentworth's narrow focus on physical damage to the facilities and the immediate costs associated with clean-up and improved security.

Nor does her narrow focus accurately reflect the framing of the issue submitted to the jury. As indicated above, the court instructed the jury that, for Hobbs Act purposes, property includes the right to conduct a business free from wrongful force, coercion or fear. Further, the trial record makes clear that the jurors had no question as to what that instruction meant, for though they sent the court a note during deliberations asking about the Hobbs Act elements and the definitions of "commerce" and "extortion," they stated, "we are all clear on property." (Tr. 984.)

The evidence presented by the government at trial was ample to permit the jury to find that defendants' efforts were directed towards interference with the rights of Planned Parenthood and Yoffa's offices to conduct the business of providing abortions. For example, their plan was to have Campbell pour the butyric acid into ventilation systems, in order to have the fumes permeate the facilities and prevent operations for several days. Further, Campbell testified that, according to Wentworth, Arena had $2,000 to spend and was willing to pay $100 apiece for butyric acid attacks on up to 20 clinics "that were performing a lot of abortions at that time" (Tr. 533), focusing ·in particular on the Syracuse "Planned Parenthood or any abortion clinic around th[e] area" (*id.*). Gilbert testified that over the years he had observed Wentworth participating in numerous protests against Planned Parenthood (Tr. 336–40), that "Wentworth was part of Operation Rescue" (Tr. 342), and that "Operation Rescue was very open in saying they wanted to shut us down" (*id.*).

In light of all the evidence, the jury was entitled to infer that Arena and Wentworth intended the butyric acid attacks not as isolated instances of vandalism, but rather as part of an overall strategy to cause abortion providers, particularly Planned Parenthood and Yoffa, to give up their property rights to engage in the business of providing abortion services for fear of future attacks. We conclude that the

government's evidence sufficiently showed that defendants attempted and conspired to cause those facilities to give up those rights.

### 2. "Obtaining"

■ Still focusing on cost of clean-up and the expense of acquiring improved security, Wentworth also contends that "[t]he property damage sustained by Planned Parenthood could not have been 'obtained' by Mrs. Wentworth." (Wentworth brief on appeal at 34.) Again, this focus is misplaced for, as just discussed, property may be tangible or intangible, and the property at issue here was the intangible right to conduct business free from threats of violence and physical harm. In light of that intangible right, we see no merit in her argument.

■ Since the Hobbs Act concept of property is broad, "[t]he Act's requirement that property be 'obtain[ed]' is given a similarly broad construction." *Town of West Hartford v. Operation Rescue*, 915 F.2d at 101. To commit extortion within the meaning of the Act, the perpetrator of a physical attack or threat need neither seek nor receive an economic benefit. "[L]ack of economic motive does not constitute a defense to Hobbs Act crimes," *Northeast Women's Center v. McMonagle*, 868 F.2d at 1350, and·

> [t]here is no requirement that the perpetrator of an extortion receive the benefit of his act. *See, e.g., United States v. Clemente*, 640 F.2d 1069, 1079–80 (2d Cir.) ("[W]hether a Hobbs Act defendant personally receives any benefit from his alleged extortion is largely irrelevant for the purpose of determining guilt under that Act."), *cert. denied*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981).

*Town of West Hartford v. Operation Rescue*, 915 F.2d at 101–02. A perpetrator plainly may "obtain[ ]" property without receiving anything, for obtaining includes "attain[ing] ... disposal of," *Webster's Third New International Dictionary* 1559 (1976); and "disposal" includes "the regu-

lation of the fate ... of something," *id.* at 655. Thus, even when an extortionist has not taken possession of the property that the victim has relinquished, she has nonetheless "obtain[ed]" that property if she has used violence to force her victim to abandon it. The fact that the target of a threat or attack may have refused to relinquish his property does not lessen the extortionist's liability under the Hobbs Act, for the Act, by its terms, also reaches attempts. *See* 18 U.S.C. § 1951(a); *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir.1992).

■ In sum, where the property in question is the victim's right to conduct a business free from threats of violence and physical harm, a person who has committed or threatened violence or physical harm in order to induce abandonment of that right has obtained, or attempted to obtain, property within the meaning of the Hobbs Act. This interpretation seems implicit in such cases as *United States v. Anderson*, in which the Seventh Circuit upheld the Hobbs Act convictions of a defendant who had abducted and threatened to kill a doctor and his wife, refusing to release them unless the doctor promised to stop providing abortion services. *See* 716 F.2d at 447–50; *see also Northeast Women's Center v. McMonagle*, 868 F.2d at 1350.

In the present case, "obtaining" was established because the evidence was ample to permit the jury to infer that Arena and Wentworth, in perpetrating the butyric acid attacks on the offices of Planned Parenthood and Yoffa, attempted to induce them to abandon their abortion businesses. The fact that the attacks failed to achieve that abandonment is immaterial.

### 3. "Consent"

■ Pointing out that the Hobbs Act definition of coercion speaks of obtaining property from another "with his consent," Wentworth also argues that "it strains intellect to find how any damage to the

property involved here, which admittedly occurred without prior threat, fear, etc., could have been obtained by consent...." (Wentworth brief on appeal at 32.) Again Wentworth ignores the nature of the property at issue. We have little difficulty in concluding that, if Planned Parenthood and Yoffa had abandoned their lawful businesses in fear of further attacks, that abandonment would been achieved by reason of what the Hobbs Act means by "consent."

The legislative history of the Act makes clear that its proponents understood extortion to encompass situations in which a victim is given the option of relinquishing some property immediately or risking unlawful violence resulting in other losses, and he simply chooses what he perceives to be the lesser harm. *See, e.g.,* 91 Cong. Rec. 11,904 (discussing decision of business owner to pay tribute to extortionists rather than risk the physical destruction of his trucks); *id.* at 11,907 ("The man pays the money to save himself and his property."). In order to foreclose any argument by an extortionist that the relinquishment of property in such circumstances was voluntary, the Hobbs Act definition of extortion simply prohibits the extortionist from forcing the victim to make such a choice.

In this case, the jury was entitled to conclude that Arena and Wentworth sought to force the closure of the attacked health facilities by having Planned Parenthood and Yoffa choose to abandon their rights rather than risk further attacks. The "consent" element was thus satisfied.

4. *Use of Actual or Threatened Force, Violence, or Fear*

 Finally, Wentworth contends that defendants' conduct was not within the scope of the Hobbs Act because no threat was "made [to Planned Parenthood and Yoffa's offices] prior to the actual loss of the property" (Wentworth brief on appeal at 32), that the costs of clean-up thus were not "induced" by fear (*id.* at 34), and that any property lost by those facilities hence

could not have been extorted from them by "threatened force, violence, or fear," 18 U.S.C. § 1951(b)(2). This argument is meritless.

 First, the Hobbs Act prohibits unlawful conduct in the disjunctive. For conduct to come within the scope of the Act it may, for example, include either actual force, or actual violence, or the threat of violence, or the engendering of fear of force or violence. Thus, when actual violence has been used to frighten the victim into giving up a property right, it is irrelevant that that violence was not preceded by a threat. The Act

> does not limit the definition of extortion to those circumstances in which property is obtained through the wrongful use of fear created by implicit or explicit threats, but instead leaves open the cause of the fear.

*United States v. Abelis,* 146 F.3d 73, 83 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 527, 142 L.Ed.2d 437 (1998); *see also United States v. Covino,* 837 F.2d 65, 68 (2d Cir.1988) (a "direct threat of future harm is not necessary to establish the reasonableness of the alleged victim's fear" of future economic loss); *United States v. Capo,* 817 F.2d 947, 951 (2d Cir.1987) (*en banc*). A properly instructed jury may properly infer, in appropriate circumstances, that actual violence constitutes a threat of repeated violence, designed to engender fear sufficient to induce the victim to give up its property right.

 Second, as discussed in Part II. B.2. above, the Act reaches not only acts of violence that succeed in achieving the ends specified in the statute, but also attempts and conspiracies that are meant, but fail, to achieve those ends.

In the present case, the government's evidence established that Campbell's pouring of butyric acid into the facilities of Planned Parenthood and Yoffa had an immediate physical impact on those facilities, sufficiently severe to necessitate mass evacuations of patients and clinic person-

nel. Exposure to the acid's noxious fumes normally may cause irritation to the eyes and respiratory tract; in these instances, the acid attacks caused a number of those persons to experience serious physical symptoms and resulted in significant property damage to both facilities. We have little difficulty in concluding that Campbell's acts constituted an actual use of force and violence within the meaning of the Hobbs Act.

Further, there was ample evidence that the attacks themselves were construed as threats of additional attacks on the facilities, and on persons associated with them, in the event that the facilities failed to give up their abortion practices. Yoffa testified: "Because of what these people did, my family, my wife, myself, our patients, our staff, have lived in fear from that day to this day." (Tr. 448.) Numerous patients refused to return to Planned Parenthood and Yoffa's offices; at least one long-time employee resigned from Yoffa's staff in fear for her personal safety. Planned Parenthood hired a full-time armed guard for its premises; Yoffa purchased personal alarms for his staff and a remote starter for his car, in order to protect against acts of personal violence. Gilbert testified that the attack made him feel "vulnerable," "unsafe," and unable to protect his patients and staff (Tr. 301), and that he viewed the April 14 attack on Planned Parenthood as a threat, i.e., "to say what we will continue to do to you if you don't shut down" (Tr. 344).

On this evidence, the jury easily could have concluded that reasonable persons in the victims' positions would have perceived the butyric acid attacks to be part of a pattern of violence, intimidation, and threats whose goal was to cause the attacked facilities to cease the business of providing abortion services. The jury was entitled to conclude that Arena and Wentworth, given their long history of protests against Planned Parenthood and Yoffa, knew that the victims would have such a perception, specifically sought to create

such a perception, and knowingly endeavored to exploit their victims' fears.

In sum, we conclude that the government established all of the elements of the Hobbs Act violations with which Arena and Wentworth were charged.

## C. *Arena's Other Contentions*

Arena contends principally (1) that he was denied his Sixth Amendment right to counsel (a) because of his trial attorney's choice of defenses, and (b) because the court would not allow him to discharge the attorney prior to trial, and (2) that the trial judge was biased and should have recused himself. We reject Arena's contentions.

### 1. *Ineffective Assistance of Trial Counsel*

 Arena contends that he received ineffective assistance of counsel because his trial attorney Frank Policelli (1) conceded that Planned Parenthood and Yoffa purchased goods in interstate commerce and that Michelle Campbell had poured the butyric acid in those facilities at Arena's request, and (2) failed to mount defenses focused on the right to protest abortion and on a claim of "necessity" (Arena brief on appeal at 18). His arguments lack merit.

 To establish a constitutional claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for the deficiency, the likely outcome of the proceeding would have been different. *See, e.g., Strickland v. Washington*, 466 U.S. 668, 687–96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hooper v. United States*, 112 F.3d 83, 87 (2d Cir.1997); *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir.), *cert. denied*, 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995). Failure to make a meritless argument does not amount to ineffective assistance. *See, e.g., id.* Nor does an action or omission that " 'might be considered sound trial strate-

gy'" constitute ineffective assistance. *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

Arena has not made the requisite showing. Plainly, in light of our discussion in Part II.A. above of the sufficiency of the government's evidence of a nexus with interstate commerce, any dispute as to that element would not have changed the outcome of the case, and Policelli's election not to dispute that element may be viewed as sound trial strategy.

Nor was it ineffective assistance for counsel to concede that Campbell had committed the acid attacks in collaboration with Arena, for Arena had pleaded guilty in state court to the exact conduct that was at issue in the present case. In the circumstances, it was a reasonable strategy to concede that the events alleged took place and to argue instead that they did not constitute extortion within the meaning of the Hobbs Act.

Finally, Arena has shown no prejudice resulting from Policelli's alleged failure either to present his alleged defense of "necessity"—whose applicability to this case Arena does not explain—or to "present[ ] Mr. Arena's pro-life, anti-abortion positions as part of the defense" (Arena brief on appeal at 10). The right to hold such views was never an issue; and in the context of this case, counsel may well have chosen not to emphasize those views in order not to add to the evidence of extortionate intent.

### 2. *Arena's Attempt To Discharge Policelli*

 Nor is there merit in Arena's contention that his Sixth Amendment right was violated because the district court denied a pretrial request by Arena to discharge Policelli. The right to counsel "cannot be manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." *United States v. Llanes*, 374

F.2d 712, 717 (2d Cir.) (internal quotation marks omitted), *cert. denied*, 388 U.S. 917, 87 S.Ct. 2132, 18 L.Ed.2d 1358 (1967). Judges have an obligation to ensure that requests on the eve of trial for appointment of a new attorney are not allowed to become a vehicle for achieving delay. *See, e.g., id.; United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir.1996); *United States v. McCormick*, 993 F.2d 1012, 1013 (2d Cir. 1992). The denial of a defendant's request for a continuance will not be reversed absent a showing both of arbitrariness and of prejudice to the defendant. *See, e.g., Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *United States v. Weinberg*, 852 F.2d 681, 687 (2d Cir.1988). Neither showing is made here.

Arena's request that Policelli be discharged was made on the eve of trial and was openly part of an attempt, just days before trial, to have the district judge recuse himself and to delay the trial. Trial was to begin on December 11, 1995. On December 6, Arena moved for recusal and a continuance and sent the district judge a letter stating that Arena would fire Policelli if the judge did not recuse himself. In the letter, Arena stated, *inter alia*, "the last thing I want to do is to fire my attorney, Frank Policelli for whom I have the highest respect" (Letter from Arena to district judge, dated December 3, 1995, at 2); "[t]his letter, frankly, is another attempt to try to convince you to recuse yourself from being the trial judge" (*id.* at 1); and "[i]f you insist on continuing the trial I intend to fire [Policelli]" (*id.* at 3). At oral argument just before the commencement of the trial, Arena reiterated this stance. He began, "Let me first say I am totally, totally pleased with my attorney, Frank Policelli." (Tr. 13.) He then informed the court, "[i]f you withdraw from this case this afternoon, I will continue to be represented by Attorney Policelli, if he will accept me as a client, that is" (Tr. 15); and "[i]f you refuse to withdraw from

this case, then I will fire Mr. Policelli and from there on will be representing myself." (Tr. 16).

It is clear that Arena sought to delay the trial. His letter stated that if Policelli were discharged, a new attorney would need an adjournment in order to prepare for trial. At oral argument on the day the trial was to begin, Arena stated that if he proceeded *pro se,* he would need time to prepare and to conduct discovery. He acknowledged, "I am not making any secret of the fact I do want a delay" (Tr. 32).

The district court denied the motion to recuse, *see* Part II.C.3. below, and, noting Arena's avowed satisfaction with Policelli, denied the motion to discharge Policelli; but it gave Arena the option of either proceeding with Policelli as his attorney of record or proceeding *pro se* with Policelli as his legal advisor. When Arena sought to have Policelli's fees for continued representation paid from public funds, the court assented. Given this record, in which Arena extolled Policelli's services and openly acknowledged that he sought to dismiss counsel solely in order to manipulate the judicial process, the district court's refusal to discharge Policelli plainly was neither arbitrary nor unreasonable.

### 3. *Recusal*

In motions before and after trial, Arena moved unsuccessfully to have the district judge recuse himself, asserting (1) that the judge (a) had denied Arena bail pending trial in the present case and (b) had ruled adversely to Arena some 10 years earlier in a matter concerning inclusion of a float in the Syracuse St. Patrick's Day parade, and (2) that "[i]t is believed" that the judge's "wife contributed financially to Planned Parenthood" (Affidavit of Frank Policelli dated December 4, 1995, ¶ 2 ("Mr. Arena believes that this sole fact creates a prejudice on the part of your honor because Planned Parenthood is a victim named in this indictment.")). Arena pursues his recusal contention on appeal. We see no basis for reversal.

A judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), and where he knows that he or his spouse "has a financial interest in the subject matter of the controversy or in a party to the proceeding," *id.* § 455(b)(4). "Specific instances where recusal is required include situations in which the judge has a personal bias or prejudice concerning a party." *Diamondstone v. Macaluso,* 148 F.3d 113, 120 (2d Cir.1998) (internal quotation marks omitted). Recusal is not required, however, when the alleged interest or bias on the part of the judge or his spouse is "not direct, but is remote, contingent, or speculative." *United States v. Morrison,* 153 F.3d 34, 48 (2d Cir.1998) (internal quotation marks omitted); *see also United States v. Thompson,* 76 F.3d 442, 451 (2d Cir.1996). Adverse rulings in other litigation or the same litigation involving the party seeking recusal generally do not constitute a basis for recusal. *See, e.g., Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *United States v. Daley,* 564 F.2d at 651. Recusal motions are committed to the sound discretion of the district court, and we review the denial of such a motion only for abuse of discretion. *See, e.g., Diamondstone v. Macaluso,* 148 F.3d at 120; *United States v. Conte,* 99 F.3d 60, 65 (2d Cir.1996).

Applying these authorities in the present case, the district judge found no basis on which his impartiality could reasonably be questioned. The fact that the judge had previously made rulings adverse to Arena was not a ground for recusal. The judge rejected the remaining ground, noting that Planned Parenthood, though identified as a victim, was not a party to the action, and that any contribution by his wife to Planned Parenthood did not constitute a financial interest in the organization. Arena submitted no documentation of his financial-contribution contention, nor any other evidence to show

that the district court was biased. The judge determined that there was no reasonable basis for questioning his impartiality, and the record before us provides no basis for finding in that conclusion an abuse of discretion.

 Finally, we see no merit in Arena's contention, raised for the first time on this appeal, that the district court exhibited religious bias by asking Arena, during argument of his pretrial recusal motion, whether he wanted a Catholic judge. The colloquy was as follows:

THE COURT: What kind of judge would you want on this case? Would you want a Catholic?

DEFENDANT ARENA: That's the last one I would want.

THE COURT: Do you want a Southern Baptist? Would you want an atheist? What kind of judge would you want?

DEFENDANT ARENA: I want—I want a judge, your Honor, unlike you ... who sympathizes with Planned Parenthood and its abortion industry. I don't care if he is a Catholic or a Jew or anyone else as long as he has no connection with this type of an organization.

(Tr. 28–29.) We do not see in this colloquy any bias on the part of the judge.

### D. *Wentworth's Other Contentions*

Wentworth also raises several additional claims of error, contending principally that she was subjected to double jeopardy and that she was prejudiced by an evidentiary ruling and by one aspect of the court's charge to the jury. She also argues that she is entitled to a new sentencing proceeding because the district court failed to place on the record its reasons for the sentence imposed. We reject all of her contentions.

### 1. *Double Jeopardy*

 Wentworth's claim that her Fifth Amendment right to be free from double jeopardy was violated by the feder-al prosecution, following the state prosecution, is meritless in light of the principle of dual sovereignty. Under that principle, a defendant in a criminal case may be prosecuted by more than one sovereign without violating principles of double jeopardy. *See, e.g., Heath v. Alabama*, 474 U.S. 82, 88–89, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); *United States v. Lanza*, 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922); *United States v. Peterson*, 100 F.3d 7, 12 (2d Cir.1996). Thus, the federal government may prosecute a defendant following a state prosecution arising out of the same events. *See, e.g., Abbate v. United States*, 359 U.S. 187, 194–95, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). Although this principle is inapplicable if one of the sovereigns effectively controlled the other, and the subsequent prosecution was merely a sham, masking a second prosecution by the sovereign that pursued the first prosecution, *see, e.g., Bartkus v. Illinois*, 359 U.S. 121, 123–24, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); *United States v. Peterson*, 100 F.3d at 12; *United States v. All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483, 494 (2d Cir.1995), the fact that the two sovereigns cooperated in an investigation does not warrant departure from the general principle, *see, e.g., United States v. Peterson*, 100 F.3d at 12.

A federal prosecutor may, in deciding whether to pursue a subsequent prosecution, take into consideration what he deems an "inadequate result" obtained in the state trial. *United States v. Ng*, 699 F.2d 63, 68 (2d Cir.1983). The fact that the federal government as a matter of policy does not routinely pursue criminal charges against a defendant who has already been convicted in state court, *see, e.g., Petite v. United States*, 361 U.S. 529, 530–31, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960) (per curiam), in no way prevents the federal government from doing so whenever it considers that the state proceeding has failed adequately to protect a federal interest, *see, e.g., United States v. Davis*, 906 F.2d 829, 832 (2d Cir.1990).

Wentworth has presented no evidence that the State of New York was acting at the behest of the federal government in bringing the state charges against her, or that the federal government acted as an agent of the State in prosecuting her for violation of the Hobbs Act. Though she makes conclusory accusations of conspiracy and collusion between the state and federal prosecutors, the record indicates simply that, after Wentworth's state prosecution, the federal government undertook an independent analysis and concluded that significant federal interests had been left unvindicated by that proceeding. While Wentworth complains that the federal prosecution was motivated by the dissatisfaction of the United States Attorney with the leniency of the sentences imposed against her and Arena by the state court, that factor was plainly a permissible consideration in the assessment of whether the federal interests had been vindicated. We see no violation of Wentworth's right to be free from double jeopardy.

### 2. *Exclusion of Testimony*

Wentworth contends that the trial court erred in not allowing her to impeach Campbell by having probation officer Kelly Baumes testify that Campbell had previously stated to Baumes that Wentworth was not involved in the butyric acid incidents. The trial judge's evidentiary rulings are reviewed for abuse of discretion, *see, e.g., Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 647 n. 1, 136 L.Ed.2d 574 (1997); *United States v. Abel*, 469 U.S. 45, 54–55, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984), and we see no abuse of discretion here.

Under Fed.R.Evid. 613(b), extrinsic evidence of a witness's prior statement may be offered to impeach that witness's credibility only if, *inter alia*, the statement is inconsistent with her trial testimony. *See, e.g., United States v. Strother*, 49 F.3d 869, 874 (2d Cir.1995). In the present case, Campbell herself testified at trial that she told Baumes her mother had had

nothing to do with the incidents and was being unjustly prosecuted. Thus, the proffered Baumes testimony would have been consistent with and duplicative of that portion of Campbell's testimony. The exclusion of the proffered testimony was not an abuse of discretion.

### 3. *The Instruction Describing Wentworth's State Convictions*

Wentworth also complains that, in its charge to the jury, the district court misrepresented her state court convictions by stating that she had been found guilty of all of the New York State charges, when in fact she had been "acquitted of the violation of the U.S. Environmental Protection Act" (Wentworth brief on appeal at 44). This argument does not accurately characterize the state-court record.

At the state trial, the jury in fact found Wentworth guilty on all of the counts that were submitted to it. Prior to the submission of the case to the jury, two counts charging violation of state environmental protection law were voluntarily dismissed; there were no charges of violation of federal environmental law. The dismissal of the two state environmental charges did not constitute an adjudication, and the district court properly refused to instruct the jury here as to Wentworth's claimed "acquitt[als]" (*id.*). The description given to the jury in the present case was substantially correct, and it was immediately followed by an instruction that the jury was to decide the federal charges solely on the basis of the evidence presented at the federal trial. We see no basis for reversal.

### 4. *The Sentencing Record*

Finally, we reject Wentworth's contention that there should be a remand for resentencing because her sentencing proceedings were not recorded. Although an equipment malfunction led to an incomplete transcription of those proceedings, the record was thereafter reconstructed in accordance with Fed. R.App. P. 10(c). Wentworth has presented no challenge to

the accuracy of the reconstructed record, and that record reveals no error warranting resentencing.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and have found them to be without merit. The judgments of conviction are affirmed.